**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| FRANCIS G. MITCHELL | ) | |
| 715 CLOVELLY LANE | ) | |
| DEVON, PENNSYLVANIA 19333 | ) | **Case No.  1:22-CV-02352(LTS)** |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| CHRISTOPHER FRATTINI | ) | |
| GREGORIOS HATZIMICHAEL | ) | |
| MOZART PRUDENT | ) | |
| Respondents. | ) | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO VACATE, MODIFY OR CORRECT ARBITRATION AWARD**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | TABLE OF AUTHORITIES AND CITATIONS | (i) |
| II. | PRELIMINARY STATEMENT | 1 |
| III. | FACTUAL BACKGROUND | 1 |
| | 1. Pre-arbitration | 1 |
| | 2. Arbitration Proceedings | 7 |
| | 3. Vacatable Offenses | |
| IV. | GROUNDS TO VACATE AND REMAND, MODIFY OR CORRECT | 8 |
| | 1. FAA VACATE AND REMAND GROUNDS | 8 |
| | 2. FAA MODIFY AND CORRECT GROUNDS | 8 |
| V. | ARGUMENTS AND STANDARDS OF REVIEW | 9 |
| VI. | CONCLUSION | 17 |

# I. TABLE OF AUTHORITIES AND CITATIONS

## Citations

*PaineWebber Group, Inc*. v. *Zinsmeyer* Trusts P'ship,  187 F.3d 988, 991 (8th Cir. 1999)…………13

*Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc*., 335 F.3d 497, 503 (6th Cir. 2003);..13

*Bonar v. Dean Witter Reynolds, Inc*., 835 F.2d 1378, 1383 ( 11th Cir .1988)…………………………13

*Morelite v. N.Y.C. Dist. Council Carpenters*, 748 F.2d 79, 83-84 (2d Cir. 1984)………………........14

*National Football League Mgmt. Council v. National Football League Players Ass'n*,
820 F.3d ```549 (2d Cir. 2016) ("*NFL Council*");……………………………………………..……14

*Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co*., 668 F.3d at 64; …………14

*Applied Indus. Materials Corp. v. Ovalar*, 492 F.3d 132, 137 (2d Cir. 2007)…………………………14

<u>*UBS Fin. Servs. v. Asociación de Empleados del Estado Libre Asociado de P.R.*</u>, 997 F.3d 15,
17-20 (1st Cir. 2021) (citing cases)……………………………………………………………………..…14

*Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 253-54 (3d Cir. 2013) (citing cases); …..14

*ANR Coal Co. v. Cogentrix of North Carolina, Inc*., 173 F.3d 493, 500-01 (4th Cir. 1999);…………14

*Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989)…………………………..……14

*Kolel Beth Yechiel Mechil of Tartikov,. v. YLL Irrevocable Tr.,* 729 F.3d 99, 106 (2d Cir. 2013…..15

*Sphere Drake Ins. Co. v. All American Life Ins. Co*., 307 F.3d 617, 623 (7th Cir. 2002)*, reh'g denied, Nov. 4, 2002, cert. denied*, 538 U.S. 961 (2004)……………………………………………..……15

*Ovalar*, 492 F.3d at 137-38………………………………………………………………………………...16

Poller v. Bioscrip, Inc. 974 F. Supp. 2d 204 (2013)…………………………………………………….22

USI Ins. Services, LLC v. Miner, 801 F. Supp. 2s 175 (SDNY 2011)…………………………………22

## Statutes

9 U.S.C  §§ 10 and 11………………………………………………………………….…………4, 12, 16

## Other Authorities

FINRA's Code of Arbitration of Industry Disputes……………….……………….3, 4, 5, 11, 14, 17, 20, 21

FINRA Dispute Resolution Arbitrators Guide……………………………….……………………...18, 19

## II.  PRELIMINARY STATEMENT

Petitioner, Francis G. Mitchell ("Mitchell") has moved this Court for an order vacating, modifying, or correcting an Award by a three-member arbitration panel conducted through FINRA's Dispute Resolution, Inc, in favor of Respondents Christopher Frattini, Gregorios Hatzimichael, and Mozart Prudent.  The arbitral panel issued a final amended award **(Exhibit 1)** in the County of New York upon the disputing parties on December 22, 2021.  Petitioner also seeks an order of remand for rehearing by a new arbitration panel.

## III.  FACTUAL BACKGROUND

**1. Pre-Arbitration**

Petitioner is a financial services executive with a career spanning fifty-years in the investment industry, where he held multiple senior management positions as an owner, managing partner or senior executive consultant and adviser for more than ten small, medium, and very large investment firms.

In April 2014, Petitioner purchased and acquired the rights of ownership to a book of business consisting of an investor client-list asset from a troubled NY broker dealer, (John Carris Investments, Inc., ("JCI")), **(Exhibit 2).**

This purchase included the good-will value of the asset and certain related assets that contributed thereto including a data base of client related non-public, proprietary, and confidential information and trade secrets and the employment and restrictive covenant agreements entered into with the employees who serviced the accounts (including Respondents).

Petitioner also entered into an agreement with another broker, (Coastal Equities, Inc.("CEI")) **(Exhibit 3)** where Petitioner would own and manage a branch office and supervise the servicing employees who were paid a percentage of the commissions generated through investment client transactions.

Petitioner offered some, but not all, of the JCI service employees continued employment under the terms and conditions of the assigned employment agreements and payout schedules **(Exhibit 4).**

Petitioner also entered into verbal supplemental agreements with each of the employees who agreed to renew their existing employment agreements at the earlier of April 24, 2015, or the end of their existing agreements, with a new term of employment ending on April 24, 2017.

As consideration for the extended term commitments, Petitioner agreed that all renewal agreements would contain a non-compete sunset date of April 24, 2017, where all employees would then own their book of business upon termination thereafter for any reason and could continue servicing their clients (with client approval) without triggering the 24-month non-compete covenant.

Petitioners' investment was quickly followed up with additional and ongoing investments to establish a high-quality investment platform, absorb the high costs of approving and gaining client approval to transition their accounts from JCI to Petitioners' control and supervision at the new branch office, and in providing a state-of-the-art physical plant including technology, communications, support services and operational support staff necessary to attract and keep quality account service employees and provide high-caliber investment services to the prospective clients purchased and prospective new clients.

Over the initial five-month transition period, Petitioners' branch office generated $932,000 in revenues **(Exhibit 5)** where Petitioner should have realized operating revenues of $487,000  after CEI fees and service employee commission payments.

However, though CEI did pay each of Petitioners' service employees monthly as directed by Petitioner, CEI had failed to make any of the required monthly residual payments to Petitioner.

On September 30, 2014, CEI unilaterally provided 60-days advanced notice of their intent to terminate their agreement with Petitioner effective November 30, 2014.

Under the terms of the CEI' agreement, upon termination, CEI had an enduring obligation to protect the proprietary and confidential client information that Petitioner had entrusted to them and was obligated to provide assistance to Petitioner in transferring his client accounts to another broker of his choice.  CEI was also precluded from hiring Petitioners' service employees for a period of three-years after termination..

On December 1, 2014, the Respondents breached the terms of their agreements and interfered with Petitioners agreement with CEI by inducing and causing CEI to disavow and fail to honor its binding post-termination contract terms with Petitioner.

Respondents negotiated a separate agreement with CEI to set up a new branch office under their management and seized control of Petitioner's client-list asset, non-public confidential data base of client trade-secret information, and the services platform that Petitioner had established, and converted these to their own use and enrichment at Petitioner expense while depriving him of the profits of his investment and property to which he was justly entitled.

Respondents also induced certain other Petitioner employees to breach their agreement with Petitioner and join their enterprise at Petitioners' expense.

## 2.  Arbitration Proceedings

On November 3, 2020, Petitioner filed a statement of claim seeking damages from the Respondents through FINRA's) Dispute Resolution, Inc., which provides a forum and procedural framework for the resolution of disputes among industry members submitted under Rule 13000 of FINRA's Code of Arbitration of Industry Disputes

### (a) The Arbitration Submission Agreements

It is beyond dispute that, by their signatures **(Exhibit 6)**, each of the parties to the arbitration proceedings freely acceded to the authority of the arbitration forum through the contained in their signed arbitration submission agreements

It is further beyond dispute that the first three stipulations of the submission agreements are unambiguous as to the parties' intent and agreement to:

- *submit the matters in controversy in accordance with;*
- *affirm awareness of and agree to be bound by;*
- *agree and understand that the arbitration will be conducted in accordance with*
- **the FINRA Code of Arbitration Procedures and Rules.**

Clearly, it was the desire, intent, and bargained for agreement of the parties that the

arbitration proceedings should rely on and be conducted in accordance with the FINRA Code of

Arbitration Procedures and Rules.  This is confirmed by the Code's very first Rule that states:

> **13101 Applicability of Code and Incorporation by Reference**
> **(a) Applicability of Code**
>
> *"The Code applies to any dispute that is submitted to arbitration under the Code pursuant to Rules 13200, 13201, or 13202.*
>
> **(b) Incorporation by Reference**
>
> *When a dispute is submitted to arbitration under the Code pursuant to an arbitration agreement, the Code is incorporated by reference into the agreement."*

Moreover, where the parties have already agreed to submit their controversies  in

accordance with, being bound by, **and to be conducted in accordance with FINRA's Code of**

**Arbitration Procedures and Rules**, the parties themselves have, in fact limited the authority of

the arbitrators to conduct themselves or the proceedings in any manner that is not consistent

with FINRA's code of Arbitration Procedures and Rules, for to do so would clearly represent

actions in excess of the authorities jointly granted by the parties as confirmed in Code Rules

13413 and 13414 which state:

> **13413. Jurisdiction of Panel and Authority to Interpret the Code**
> The panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties.

Parties seeking to enforce arbitration awards that are questionable, illogical , or were

rendered by any of the means prescribed in 9 U.S.C. § § 10 and 11 love to quote Code  Rule

13413 because it appears to provide the arbitrators carte blanche protection against their errors

and misdeeds and allowing them to conduct themselves or the proceedings in any manner they

choose.  In reality, however, the exact opposite is true as confirmed in subsequent Code Rule

13414 which states:

> **13414. Determinations of Arbitration Panel**

All rulings and determinations of the panel must be made by a majority of the arbitrators, unless the parties agree, or the Code or applicable law provides, otherwise

While on the surface 13414 appears to confirm the arbitrator carte blanche theory, but on closer inspection what it really says is unless the parties agree, or the Code or applicable law provides otherwise.

Thus, where an arbitrator departs from reliance on the Code is is exceeding his authority by violating the bargained for arbitration agreement that the parties themselves have already approved in their submission agreements that clearly states: **to be conducted in accordance with FINRA's Code of Arbitration Procedures and Rules.**

While the arbitrators have been granted the authority to interpret the Code Rules they cannot pretend they do not exist.  Thus, a Rule is a Rule,  just as a defined procedure is just that also, because the parties have already agreed that is so.

## 3.  Vacatable Offenses

### (a) Non-disclosed Ex Parte Communications

Since the conclusion of the arbitration, Petitioner has discovered and can fully demonstrate that the award in this arbitration was procured through acts of fraud and collaboration between Respondents' lead-counsel and the arbitration Panel Chair to include possible corruption of that same Panel Chair.

Petitioner can show a direct causal nexus between Respondent lead-counsel and all panel members to include non-disclosed email communications between Respondents' counsel and the panel members and other documentary evidence that will prove a collaborative and clandestine relationship likely existed between the Respondent's counsel and the Panel Chair and one or more panel members, where such fraudulent actions are wholly inconsistent with the Code of Arbitration Procedures and Rules and with Petitioners bargained for arbitration.

Where the Panel Chair and panel members conducted a virtual mock arbitration hearing for the sole purpose of providing an opportunity for Respondents to submit a faulty motion and the granting of said faulty motion that was 1) never moved) 2) submitted pending the completion

of Petitioners case in chief (that the Panel Chair did not permit to occur and therefore never occurred and was denied through illicit acts on the part of the Panel Chair in collaboration with Respondents Lead Counsel and a similar fraudulent and collaborative effort to improperly dismiss Petitioners case against Lead-Counsels clients and a similar conspiracy between the Panel Chair and Respondents' Lead-Counsel to extract attorney fees from Petitioner where such fees were not assessable through prior agreement of the parties.

Where Petitioner has been grievously harmed and injured through a series of fraudulent and illicit acts, that prejudiced Petitioner and subjected him to extreme bias as a result of the illicit collaboration and where the parties bargained for arbitration has been egregiously violated by both Respondents and one or more arbitrators, where Petitioner is fully entitled to an order to vacate the faulty award and have the matter remanded for rehearing by a new arbitration panel.

### 13414. Ex Parte Communications…

(a) Except as provided in Rule 13211, no party, or anyone acting on behalf of a party, may communicate with any arbitrator outside of a scheduled hearing or conference regarding an arbitration unless all parties or their representatives are present.
(b) No party, or anyone acting on behalf of a party, may send or give any written motion, request, submission or other materials directly to any arbitrator, unless the arbitrators and the parties agree, or the Code provides otherwise.
Aside from the applicability of this Rule as it pertains to the agreement of the parties, the parties are also offered an opportunity to permit certain communications or prohibit all such communications as part of the scheduling hearing and the subsequent order issued by the panel summarizing same. The following is taken from the from the scheduling order:

#### PARTY AND ARBITRATOR COMMUNICATIONS

● **Parties and arbitrators do not agree to voluntary direct communication between the parties and arbitrators. Parties should not communicate with any member of the Panel except in the presence of all parties or representatives. All correspondence and pleadings must be sent to the FINRA Dispute Resolution staff and served on all parties via the DR Portal.** (Emphasis added)

### 13408. Disclosures Required of Arbitrators

**(b)** the obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination described in paragraph (a) is a continuing duty that requires an arbitrator who accepts appointment to an arbitration proceeding to disclose, at any stage of the proceeding, any such interests, relationships, or circumstances that arise, or are recalled or discovered.

The known email communications in question.**(Exhibits 10.2 and 10.4)**, were both sent from the lead-counsels' personal email address and were directly sent to all panel members in the first instance and the Panel Chair in the second instance.  In both instances emails were sent approximately one hour prior to previously scheduled panel hearings where topics to be heard and argued by the parties were discussed in the emails that offered strongly worded opinions on the matters and included derogatory and disparaging comments about the Petitioner, his motives, ethics, etc., discussed the overall substance of the matter and were clearly intended to sway and influence the panel members to benefit the Respondents.

**(b) Mock hearing to justify accepting the faulty motion and dismissing case**

The Panel Chair hijacked the scheduled hearing without warning, changed the format to something not recognizable to the Petitioner who has participated in close to fifteen different arbitration proceedings over the course of his 50 -year career in the industry.

Where Petitioner had two full days of testimony, evidence, exhibits and witnesses to call on the second day, that were not allowed to be heard.

The Panel Chair himself suggested Petitioner admit agreements into evidence to make it appear legitimate, but Petitioner understood himself to be in some type of unrequested, unscheduled, and unbriefed "stipulation of facts" hearing (where his explanation prior to opening the "bifurcated" hearing never suggested that Petitioner would be denied his bargained for right to present his case as prepared.  Such an admission would have drawn an immediate response from Petitioner.

 It was a prejudged, predetermined outcome where the Panel Chair himself prior to hearing a single word of testimony, and where presentations had not yet started, announced to the room that he was "anticipating" a motion to dismiss from Respondents that day.. How prescient of him. where we were scheduled for 3-4 days of hearings.  In fact, the only true words that were uttered about the sham "bifurcated" hearing was his suggestion that he believed this

different approach would save some time.  Because through the magic of "bifurcation" the Panel Chair was able to squeeze four days of hearings into two and a half hours.

The sole purpose of the hearing was to provide a vehicle for any type of motion that could be acted on out of ear shot in executive session and then granted. In fact, after hearing the tapes, it is my sense, that The Panel Chair even spent a considerable amount of time haranguing about the restrictive covenant agreements (RCA), as a hint to opposing counsel that his motion should contain grounds related to the RCA.  But it seems  opposing counsel missed the hint.. Consequently, the motion granted did not even address the grounds indicated for granting it in the first place.

But without presentations by either side where Respondents didn't admit a single document nor call a single witness and the only person who testified on behalf of the Respondents was opposing counsel, who, while never once offering a stitch of evidence to support his false and misleading statements that were baseless..

### (c ) Denied Petitioner right to counsel

Petitioner was denied his bargained for right to representation during the arbitration when existing counsel suddenly became seriously ill and had to withdraw and the Panel Chair implemented stringent conditions that precluded Petitioner from securing representation despite FINRA policy and Rule that states:

> *13208  Representation of Parties… (or how Panel Chair denied right to counsel)*
> *(b) At any stage of an arbitration proceeding held in a United States hearing location, all parties shall have the right to be represented by an attorney at law in good standing and admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States, unless state law prohibits such representation.*

### (d)  Petitioner denied postponement with good cause shown…

Over the course of the arbitration, Petitioner was denied multiple petitions for good cause shown.  There were three discovery related postponement requests and two others described here: the first involved the need for replacement counsel when existing counsel was

forced to withdraw suddenly due to a serious illness, and the second where Petitioner fell ill with Covid -19.symptoms two-days prior to a scheduled hearing.

Despite FINRA's clear and unambiguous policy that all parties have a right to counsel at any stage of an arbitration process, the Panel Chair, refused to consider a reasonable request to postpone to secure replacement counsel  after existing counsel was force to withdraw due to a sudden serios illness.  Petitioner was severely prejudiced by the Panel Chairs' actions where he refused to provide the time requested or more if necessary where he provided less time than was requested but attached unrealistic restrictive conditions on Petitioners;' selection options that denied Petitioner his agreed upon rights to representation.

### 13208 (b) Representation by an Attorney (Denied)

*At any stage of an arbitration proceeding held in a United States hearing location, all parties shall have the right to be represented by an attorney at law in good standing and admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States, unless state law prohibits such representation.*

### Panel Chair refuses postponement  due to illness

On Friday evening, October 1, 2021, a mere two and a half days prior to the scheduled hearings on October 4, 2021, Petitioner began suffering with an acute upper respiratory infection **(Exhibit 9.7)**, where Petitioner had recently been exposed to parties diagnosed with Covid-19.  Petitioner was displaying nine of the eleven symptoms listed on the FINRA Covid attendance protocols list and was ineligible to physically attend the hearings based upon FINRA's own Covid protocols.  Petitioner was tested for Covid but was advised that the test results may take 4-6 days.  Because Petitioner is a high-risk individual of advanced age with multiple co-morbidities, counsel asked me to send him a copy of my diagnosis paperwork which he then forwarded through the DR Portal to the Director with a request to postpone hearings. Postponement **request was denied** despite no previous postponement requests smf FINRA guidance warning that refusing good cause requests could result in an award being vacated Petitioner was required to attend (or not) via Zoom, which is what the Panel Chair then gave

Petitioner no choice but to do, despite still suffering with a high fever and poor lung function on the day of the October 4, 2021,pending hearing..

FINRA's own Dispute Resolution Arbitrators Guide states as follows on page 23 Under the heading **Before Proceedings Begin:**

### Determine Whether There is a Senior Ill Party Involved

"FINRA expects its arbitrators to be sensitive to the needs of senior or seriously ill parties when scheduling hearing dates, resolving discovery disputes and determining the reasonableness of postponements."                              [

And with specific regards to contested motions for postponements the Arbitrators Guide states as follows:

### Motion to Postpone a Hearing

FINRA Rule 12601 provides that arbitrators may postpone any hearing(s) either on their own initiative or at the request of any party to the arbitration. A party may request that the arbitrators postpone a hearing for a variety of reasons, such as the sudden inability of a necessary party, counsel or material witness to appear.

### Contested Motion to Postpone

*When parties request a postponement without the agreement of all parties, the panel may not grant a postponement request made within 10 days of a scheduled hearing session, unless the panel determines that good cause exists. In deciding whether to grant a contested postponement request, the arbitrators should consider the following factors:*

- *fairness to the parties;*
- *the objection of the opposing party;*
- *the merits of the request;*
- *previous postponements; and*
- *the ability to conduct a productive hearing.*

*\* Arbitrators should be aware that certain statutes permit parties to move to vacate arbitration awards by alleging that arbitrators exceeded their authority by refusing to grant a reasonable postponement request.* (Emphasis added)

**(e)  Petitioner denied fair and equitable discovery…**

**Prejudicial Partiality In Discovery  Process**

By failing to enforce the Code Rules and Procedure related to discovery issues, The Panel Chair showed distinct partiality to Respondents that was highly prejudicial to Petitioner, prevented a full assessment of liabilities and damages, where the Panel Chair 1) Failed to provide fair and equitable discovery; 2) Failed to enforce fair and equitable discovery; 3) Failed to issue requested discovery subpoenas with good cause shown; \* 4) Inequitably assessed sanctions

In one particularly egregious instance, Respondents produced an internal email where the email shows an attachment containing information Respondents had already denied as

being in their possession.  This was discovered by Petitioner after counsel was forced to

withdraw due to a serious illness.  On a pro se basis Petitioner sought the attachment and

certain other documents that Respondents had not yet produced even after the Panel Chair

issued an order that they do so nearly two months earlier. **(Exhibits 9.1 and 9.2).**

The Panel Chair denied Petitioners' just motion and failed to take any action to compel

production or impose sanctions on Respondents, despite Petitioners' request for such in the

motion, and despite the Panel Chair having previously imposed a $250 sanction against

Petitioner at the request of Respondents where they sought a document that Petitioner had

pointedly denied ever possessing and in fact never existed (Exhibits 9.3 to 9.6).  In the order

denying Petitioners' motion to compel, the Panel Chair stated as follows:

> ***Claimant's Motion is Denied, without prejudice to its being renewed if the Panel determines that Claimant is entitled to an award of damages against Respondents and that the information produced by Respondents in response to Claimant's discovery demands is insufficient for the Panel to determine the damages to which Claimant is entitled. 11/18/21***.

Clearly, this is a backwards approach that is inconsistent with the Code of Arbitration,

since Petitioner would not be able to prove liability on the part of Respondents without the

requested documents and consequently the panel never got to see this material non-cumulative

evidence. The actions described here represent both prejudicial misconduct on the part of the

Panel Chair and may even suggest pre-judgement on his part, while also  representing a

violation of the parties' agreement on the part of Respondents for failing to perform in

accordance with the Code of Arbitration.

## IV. GROUNDS TO VACATE, MODIFY OR CORRECT AND REMAND

## 1.  FAA Vacate and Remand Grounds 9 U.S.C. §  10

Section 10 of the Federal Arbitration Act provides a safety net in the form of a motion or

petition to vacate the award, and Section 10 (a) defines the grounds for such vacatur as being:

*"(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration*

*(1)  Where the award was procured by corruption, fraud, or undue means"*

*(2) Where there was evident partiality or corruption in the arbitrators, or either of them.*

*(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.*

*(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.*

*(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators."*

## 2. FAA Modify and Correct Grounds 9 U.S.C. § 11

"In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration

*a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.*

*(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.*

*(c) Where the award is imperfect in matter of form not affecting the merits of the controversy. The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties*

## <u>V. ARGUMENTS & STANDARDS OF REVIEW</u>

### 1.  Vacate and Remand Standards of Review

#### (1) Where the award was procured by corruption, fraud, or undue means

Section 10(a)(1) shows how Section 10 is designed to provide relief in situations where putting a court's  imprimatur on an award would deprive one of the parties of the benefit of its freely-bargained-for arbitration agreement.   It says that corruption, fraud, or undue means in the procurement of an award, whether perpetrated by the arbitrators or a party, spoils the award (assuming the aggrieved party timely moves to vacate).

There is nothing particularly controversial about that; we suspect few would contend that parties who agree to arbitrate impliedly consent to arbitration resulting in an award procured

through outright chicanery. *See, e.g.,* **PaineWebber Group, Inc. v. Zinsmeyer Trusts P'ship**, 187 F.3d 988, 991 (8th Cir. 1999) (quotations and citations omitted).   Given the gravity of all of this, three requirements must generally be satisfied to make out a claim under Section 10(a)(1):  "(1) clear and convincing evidence of fraud [, corruption or undue means][;] (2) that the fraud [, corruption or undue means] materially relates to an issue involved in the arbitration[;] and (3) that due diligence would not have prompted the discovery of the fraud [corruption or undue means] during or prior to the arbitration."   **Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc**., 335 F.3d 497, 503 (6th Cir. 2003); Section 10(a)(1) says that the "award" must be "procured" by the fraud, corruption or undue means, and that suggests a causal nexus between the proscribed conduct and the award.  While the conduct must "materially relate to an issue in the arbitration," s*ee, e.g.,* **Bonar v. Dean Witter Reynolds, Inc**., 835 F.2d 1378, 1383 ( 11th Cir .1988).

In the current matter we can clearly demonstrate a full causal nexus, between the communications on material issues, with intent to sway, influence, compromise, or intimidate.

And the resultant impact through accommodations, favors, favorable rulings, denying Petitioner an opportunity to present his case in chief, refusing to hear evidence and witness testimony granting of a faulty motion and dismissing Petitioners' claims through manifest disregard for law, precedent, contracts, and the Code of Arbitration Procedures and Rules, through the use of ex parte communications between the parties and panel members.

*(2) Where there was evident partiality, bias, fraud and or corruption in the arbitrators, or either of them.*

Under Second Circuit authority an award may be vacated "if a reasonable person would have to conclude" that an arbitrator was biased against one party or partial in favor of another. *See* **Morelite v. N.Y.C. Dist. Council Carpenters**, 748 F.2d 79, 83-84 (2d Cir. 1984); **National Football League Mgmt. Council v. National Football League Players Ass'n**,

820 F.3d 527, 549 (2d Cir. 2016) ("*NFL Council*"); ***Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.***, 668 F.3d at 64; ***Applied Indus. Materials Corp. v. Ovalar***, 492 F.3d 132, 137 (2d Cir. 2007).

The Second Circuit's "reasonable person" standard has been construed and applied by many courts since the Second Circuit's 1984 decision in *Morelite*, and has been adopted by the First, Third, Fourth, and Sixth Circuits. *See, e.g.,* **UBS Fin. Servs. v. Asociación de Empleados del Estado Libre Asociado de P.R.**, 997 F.3d 15, 17-20 (1st Cir. 2021) (citing cases); ***Freeman v. Pittsburgh Glass Works, LLC***, 709 F.3d 240, 253-54 (3d Cir. 2013) (citing cases); ***ANR Coal Co. v. Cogentrix of North Carolina, Inc.***, 173 F.3d 493, 500-01 (4th Cir. 1999); ***Apperson v. Fleet Carrier Corp.***, 879 F.2d 1344, 1358 (6th Cir. 1989).

The standard does not require a showing that an arbitrator was actually biased against one party or partial toward another, only that a reasonable person would have to conclude that was so. A determination that a reasonable person would have to conclude that an arbitrator was financially or personally interested in the outcome, or not independent, would likewise satisfy the standard.

Absent disclosure and a waiver, an arbitrator should be free from any relationships with the parties that a reasonable person would have to conclude would materially compromise his or her ability to decide the case in an impartial manner. *See Morelite*, 748 F.2d at 84-85 (father-son relationship); *Scandinavian Re*, 668 F.3d at 72 ("Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties").

The Second Circuit also imposes a heightened evidentiary standard on evident partiality claims. Like fraud claims, they must be established by "clear and convincing

evidence." *See NFL Council*, 820 F.3d at 548; ***Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.,*** 729 F.3d 99, 106 (2d Cir. 2013)."

*Enforcement of the Parties' Expectations of Neutrality Through the Disclosure Process*

To protect the parties' expectations of neutrality during the selection process, the United States Supreme Court imposed the now-familiar requirement that arbitrators disclose at the outset of the proceedings

A neutral arbitrator's failure to disclose a conflict of interest of which he or she is deemed to have knowledge can result in vacatur of an award on evident partiality grounds without any showing that the arbitrator was actually biased or that the award resulted from bias.  Indeed, as the Seventh Circuit observed, if an arbitrator unduly frustrates a party's access to information pertinent to whether he or she has the requisite degree of neutrality, there may be grounds for vacatur based not only on evident partiality, but also on the arbitrator exceeding his or her powers: "[f]ailure to comply with a[n] [express or implied] contractual requirement designed to facilitate the search for an acceptable neutral might imply that the neutral exceeded his authority, spoiling the award under 9 U.S.C. § 10(a)(4)."  ***Sphere Drake Ins. Co. v. All American Life Ins. Co*.**, 307 F.3d 617, 623 (7th Cir. 2002)*, reh'g denied, Nov. 4, 2002, cert. denied*, 538 U.S. 961 (2004).

The United States Court of Appeals for the Second Circuit indicated that the test for evident partiality can be satisfied where the arbitrator "knows of a material relationship with a party and fails to disclose it," because "[a] reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side."  *See Ovalar*, 492 F.3d at 137-38.

That the panel members and the Panel Chair failed to disclose the communications is only the lure we need to take that next step. And when we do the actions taken appear to reflect

significantly more powerful than might occur based upon mere partiality and more akin to pure bias or bias with an interest.

.  Where the panel chair goes to the extreme trouble of restructuring a hearing process with no advanced notice and interfering in the presentation of such case for the purpose of denying Petitioner's bargained for right to present his case.

Where the panel chair improperly dissuades opposing counsel from proceeding  in accordance with Code prescribed processes, and openly cross-exam and encourages  opposing counsel to submit a faulty motion and then accepting and granting that same and untimely and faulty motion, that was never "moved" but submitted for consideration where the grounds cited don't overcome the evidence and testimony provided by the only sworn party in the matter, but the motion is still granted, and where the reasons cited as justification for granting the motion and a decision to dismiss Petitioners claims are different than the grounds cited in the motion and provide evidence as to the panels manifest disregard for law, precedent, contracts, and the Code of Arbitration.

And where the reason cited as justifying the dismissal of Petitioners' claims is because of personal assumptions on the part of the Panel Chair where such assumptions would have been overcome by evidence that the Panel Chair refused to hear.

These are not acts of a fair, equitable and neutral arbitrator, nor do they reflect disinterest on the part of the arbitrators.  These are acts of extreme and intentional bias or bias with an interest.

**3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.**

Section 10(a)(3) might be referred to as a procedural due process provision, and courts sometimes suggests it defines the level of due process that must be present in an arbitration for a court to confirm the award without violating constitutional due process requirements.   We do not find that line of reasoning to be particularly helpful, and its validity is debatable.   But Section 10(a)(3) certainly prescribes a baseline level of procedural protection to parties who agree to arbitrate without expressly specifying procedural protections.   And it imposes a no-harm-no-foul rule:  procedural misconduct or misbehavior — including not following agreed procedural rules — does not undermine an award unless the misconduct or misbehavior prejudiced the challenging party.

Section 10(a)(3) says a court for may vacate an arbitration award for "misconduct" or "misbehavior."  It specifies only two types of misconduct:  "refusing to postpone the hearing, upon sufficient cause shown" and "refusing to hear evidence pertinent and material to the controversy."  But it contains a catch-all provision that authorizes vacatur when the arbitrators are "guilty. . .  of any other misbehavior by which the rights of any party have been prejudiced."

The key to Section 10(a)(3) is whether the challenging party has been denied a "fundamentally fair hearing" or has otherwise been prejudiced.

### A. Misconduct:  "Refusing to Postpone the Hearing Upon Sufficient Cause Shown"

An arbitrator's refusal to grant a continuance can be a ground for vacatur, provided the party requesting it showed the arbitrator "sufficient cause" for it to be granted.   But this ground for vacatur is no panacea for those seeking to delay the day of reckoning, and arbitrators should not consider it as such.

When courts evaluate claims premised on this ground, they usually accord the arbitrators a great deal of deference in determining what is "sufficient cause shown."  Courts are not likely to

deem "sufficient cause" was shown when the need for a continuance was the fault of the party that unsuccessfully sought it.

But when the denial of a continuance prejudiced the challenging party, and the need for it was not of the challenger's own making, then courts may grant relief.  For example, if a party who otherwise acted prudently could not produce an important witness at the hearing because the arbitrators denied a continuance, then this branch of Section 10(a)(3) may authorize a court to vacate the award.  The key questions are whether the arbitrator acted arbitrarily and whether the challenging party was prejudiced as a result.

### B.  Misconduct:  "Refusing to Hear Evidence Pertinent and Material to the Controversy"

When parties agree to arbitrate, the law presumes they intended that the arbitrators would allow them to present material and pertinent evidence supporting their position.  That does not mean that a party is entitled to present cumulative testimony or seek the broad discovery permitted by the Federal Rules of Civil Procedure.

If arbitrators exclude evidence which, if admitted and credited, would have justified a different outcome, then a court may grant relief.  Again, the touchstone is prejudice:  would the outcome have been different had the arbitrator admitted and credited the evidence?  Even if the outcome would not necessarily have been different, was the challenging party afforded a fundamentally fair hearing even though the arbitrators would not hear the proffered evidence?

### C.  Other Misbehavior that Prejudiced one of the Parties' Rights

Section 10(a)(3)'s catchall provision allows vacatur where the arbitrators engaged in "misbehavior" that "prejudiced" one of the parties.  Misbehavior does not necessarily connote intentional wrongdoing by the arbitrators.  It encompasses procedural misconduct as well as

procedural error, other than the two types discussed in Section A., above.  It also includes ex parte contacts.  But, as with "misconduct," the no harm no foul rule applies:  The challenger must show prejudice.

One example of a case that may warrant relief under the catchall provision can arise when arbitrators change the rules midstream without affording the parties sufficient notice to adjust their case-presentation strategy accordingly.  Suppose, as is similar to the instant matter, an arbitrator rules that a party does not have to present evidence in a particular form to support his or her position, or that the elements of a party's claim or defense are X, Y and Z.  Suppose the party relies on these rulings, but that the arbitrator, after the close of the hearing, rules that the party had to present evidence in a different form, or that the elements of one of the claim or defense were A, B and C, rather than X, Y and Z.   If the arbitrator issues an adverse award based on such a ruling, then the aggrieved party should be able to vacate it under the catchall provision of Section 10(a)(3).

Petitioner was left without representation or any ability to procure such due to the draconian limits imposed by the Panel Chair.

Petitioner prepared long to present a full case of evidence in accordance with the Code of Arbitration Rules and Procedures, where in our twenty-day notice it was clear that we would not be calling witnesses until the second day.  Where Petitioner had prepared a detailed presentation plan that would take close to two full days including witness testimony.  And only minutes before scheduled to begin, the Panel Chair changed the format and  refused to hear anything that Petitioner was prepared to say in a specific sequence that builds the story as it needed to be built, for the benefit of those who were not there but are now called to judge what happened then and how.

There was much in Petitioners' prepared presentation that would have shed considerable light on how much personal time, effort, expense, knowledge, expertise, reputation and risk Petitioner devoted to personally knowing, reviewing, documenting, approving, communicating, over-night mailing, monitoring, transferring, accommodating, securing and protecting the personal, confidential, and proprietary information of each of the client relationships that he didn't merely purchase, but then had to earn the right to seek their trust and their explicit approval to be converted to his control and supervision.

Only to have the sole opportunity he bargained for to remedy the many damages visited on him by the Respondents stolen on the whim of the Panel Chair who refused to grant him the key benefit of his bargain, the ability to present his case fairly and equitably before a panel of neutral and otherwise disinterested arbitrators.

## VII. CONCLUSION

Petitioner has demonstrated the clear causal nexus between the prohibited, undisclosed and inexcusable ex parte communications initiated by Respondents' experienced Lead-Counsel and which were both tolerated and not disclosed, as required by the arbitration panel members.

Where such non-disclosure denied Petitioner his right to remove such compromised arbitrator(s).

Where Petitioner has also shown the clear and convincing evidence of occurrence, intent, impact and materiality of the prohibited  ex parte communications in relationship to the multitude of Panel Chair and Panel Member actions that were severely prejudicial to Petitioner and partial to the interests of the Respondents, that breached the party's bargained for arbitration, Petitioner denied presentation of case, Petitioners' right to dismiss the compromised arbitrators, and spoiled the resulting award.

Petitioner has shown there was repeated evident partiality or corruption in the arbitrators, or either of them (to such a degree as to have violated the terms of the bargained for agreement to arbitrate while also denying Petitioner right to dismiss panel members whose objectivity had been compromised)..

Petitioner has shown repeated instances where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, refused to hear evidence and witness testimony pertinent and material to the controversy, denied Petitioner his right to counsel and denied his bargained for right to present his case in chief, and through all other misbehavior (by which Petitioners bargained for rights were severely prejudiced).

The Petitioner has shown repeated instances where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matters submitted was not made and where the Panel failed to respond to the matters in controversy and instead issued a decision only on matters never placed in controversy, or so manifestly disregarded the laws of precedents and contracts, such that that they exceeded their powers or so imperfectly executed them such that a valid final award was not made.  .

The Petitioner has shown repeated instances where the arbitrators exceeded their powers, or so imperfectly or failed to exercise authority

executed them that a mutual, final, and definite award upon the subject matters submitted was not made (and where the Panel failed to respond to the matters in controversy and instead issued a decision on a matter never placed in controversy)

And Petitioner has clearly demonstrated why the award decision to dismiss Petitioners claims against the Respondents and the award decision of granting attorneys fees despite clear and concise indemnification against doing so exists and in where an award decision itself was rendered in manifest disregard of law and contracts (such that the terms of the contracts in controversy and relevant law pertaining to same were ignored and replaced with a

manufactured and biased brand of justice on matters not in controversy where the Panel Chair had specifically refused to allow Petitioner to offer pertinent and material evidence and refused to hear witness testimony),

The Petitioner has shown repeated instances where the arbitrators exceeded their powers, by failing to interpret the employee and restrictive covenants [1] existing between the parties while being fully aware of the standards to do so yet manifestly disregarding those same standards, and by manifestly ignoring the simple language of those same agreements and ignoring same in awarding fees that violate same.  Or where the panel members exceeded their authority to interpret the Code of Arbitration Rules and Procedures and instead attempted to rewrite them. And where the Panel failed to respond to the matters in controversy and instead issued decisions on a matters never placed in controversy; or so imperfectly executed their authorized pawers that a mutual, final, and definite award upon the subject matters submitted was not made

Dated: May 13, 2022

Respectfully submitted,

By: _____
Francis G. Mitchell, Petitioner
Pro se

715 Clovelly Lane
Devon, PA 19333
Email: fgmitchell@aol.com
Phone: 610-256-3420

*See… Poller v. Bioscrip. Inc. 974 F. Supp 2d 204 (2013) and USI Ins. Services, LLC v. Miner, 801 F. Supp. 2d 175 (SDNY) (2011)*